(C. D. 1781)

PLANT PRODUCTS CORP. *v.* UNITED STATES

United States Customs Court, First Division

(Decided May 17, 1956)

*Eugene R. Pickrell* for the plaintiff.

*George Cochran Doub,* Assistant Attorney General (*Richard E. FitzGibbon* and *Joseph E. Weil,* trial attorneys), for the defendant.

*Barnes, Richardson & Colburn* (*J. Bradley Colburn* and *James F. Donnelly* of counsel) as *amicus curiae.*

WILSON, Judge: This is a case in which the issues are rather well defined between the parties. The imported merchandise consists of a product known as Parathion, a trade name, designated on the consular invoice as "dialkyl-nitro-aryl-thiophosphate-leverkusen 18." It was classified under paragraph 27 (a) (3) of the Tariff Act of 1930 by the collector as a coal-tar product, with duty at 40 per centum ad valorem and 7 cents per pound. The importer claims that the involved product should be classified either as a chemical compound under paragraph 5 of the tariff act and assessed at 25 per centum, or, in the alternative, as an ester, not specially provided for, under paragraph 37 at the rate of 25 per centum ad valorem.

A written stipulation (plaintiff's exhibit 2) was received in evidence agreeing upon the following: The imported substance is identified as diethyl-p-nitrophenyl monothiophosphate, having as its empirical chemical formula $C_{10}H_{14}NO_5PS$.

The stipulation also outlines the steps through which Parathion is produced and sets forth that nitrophenol, a product specifically named in paragraph 27 (a) (1) of the Tariff Act of 1930, is used in the manufacture of the end or imported product, Parathion. Exhibit 2 also gives the chemical structural formula of the imported product as:

$$S-\overset{\displaystyle O\,C_2H_5}{\underset{\displaystyle O\,C_2H_5}{P}}-O-\!\!\!\left\langle\!\!\!\bigcirc\!\!\!\right\rangle\!\!\!-N\,O_2$$

Plaintiff's first witness was Dr. Herbert L. J. Haller, assistant chief of the Bureau of Entomology and Plant Quarantine of the United States Department of Agriculture. He holds the degrees of "chemical engineer" from the University of Cincinnati and Ph. D. in biochemistry from Columbia University. He had had wide experience in the production, analysis, and use of insecticides, including Parathion, and had seen it used over a wide area. Dr. Haller testified that Parathion is "a phosphoric acid derivative," and, further, that it is an "alkyl-aryl ester of thiophosphoric acid," which may be regarded as an "ester of phosphoric acid" (R. 23). He stated that Parathion is outstandingly effective against aphids, mites, mealy bugs, and numerous other injurious insects on living nondormant plants. It was Dr. Haller's opinion that the insecticidal properties of Parathion are due to the "molecule as a whole." However, the following excerpts from the record would indicate an admission by the witness that the deadly toxic properties of Parathion come from its coal-tar constituent:

CHIEF JUDGE OLIVER: You mean the molecule as a whole, the coal tar derived one-third and the other two-thirds, is that what you mean?

THE WITNESS: Yes.

CHIEF JUDGE OLIVER: The entire product?

THE WITNESS: It is a specific individual compound, and if that compound is broken up, you lose its insecticidal properties.

JUDGE MOLLISON: Suppose you could isolate the one-third coal tar constituent from the two-thirds non coal tar constituent, what then would be the situation so far as insecticidal properties is concerned?

 *          *          *          *          *          *          *

THE WITNESS: The coal tar portion of the molecule would have insecticidal properties.

May I elaborate?

JUDGE MOLLISON: Yes.

THE WITNESS: However, it could not be used upon living non-dormant plants, because it has phyto-toxicoligal properties.

JUDGE MOLLISON: So from a practical standpoint of what you are trying to accomplish, that is to remove insects from these living non-dormant plants, you would have to use some sort of compound which would be non-toxic to the plant itself?

THE WITNESS: Yes, sir.

 *          *          *          *          *          *          *

CHIEF JUDGE OLIVER: Could you use the two-thirds other than the coal tar derivative as an insecticide alone?

THE WITNESS: Not in a practical way.

CHIEF JUDGE OLIVER: The other two-thirds of this molecule, that is other than the coal tar derivative, has that lethal effect on insects, or has it insecticidal properties used alone?

THE WITNESS: It has—May I qualify that?

CHIEF JUDGE OLIVER: Yes.

THE WITNESS: But not of sufficient toxicity to be of practical value.

JUDGE MOLLISON: Is the non-coal tar constituent, the two-thirds part, as a matter of purpose or plan, is that used to reduce the toxic effect of the one-third coal tar part of this merchandise on the plants?

THE WITNESS: It accomplishes that. (R. 30–32.)

The witness denied, however, that the non-coal-tar constituent acts as a carrier in any way.

For the purpose of explaining testimony he had previously given concerning the toxic properties of the coal-tar portion of Parathion, Dr. Haller testified that, if the coal-tar constituent were stabilized, it would not have insecticidal properties, whereas if the non-coal-tar part, the phosphoric acid part of the molecule, were stabilized, it would have insecticidal properties, and that the coal-tar constituent in the molecule, with reference to so-called stabilization, "becomes a linkage in such a manner that you can't disrupt it without destroying the compound" (R. 40–41). This testimony, it will be observed, is difficult to harmonize with testimony hereinbefore quoted from pages 30 to 32 of the record.

Since the testimony of plaintiff's first witness covers plaintiff's claims in great detail, such evidence has been reviewed hereinbefore at considerable length. Inasmuch as the other witnesses cover much the same ground as Dr. Haller, their evidence will be referred to only briefly.

Dr. Albert Hartzell, plaintiff's second witness, received the degree of doctor of philosophy in entomology from Ohio State University in 1923 and, from 1918 to 1922, was an instructor in entomology at Iowa State College. He had had wide experience in entomological research (R. 42–45) and has been using Parathion since 1948 only on living nondormant plants, for the control of aphids and mites.

Dr. Louis Pyenson, plaintiff's next witness, received the degree of doctor of philosophy, majoring in entomology. He had been employed as entomologist for the Long Island Agricultural and Technical Institute in Farmingdale, N. Y., where he taught entomology, including the subject of insecticides, and carried on extension work with farmers and homeowners on the problem of insect pest control. He stated that he had been familiar with Parathion since 1948.

Dr. Charles L. Mantell, whose qualifications as a chemist were conceded by counsel for the Government, was called as plaintiff's fourth witness. He testified that the products named in paragraphs 27 and 1651 are not similar to Parathion; that, while the materials in paragraphs 27 and 1651 all contain the benzene ring structure, it is the phosphorus grouping of the phosphoric acid that is basic in the case of Parathion, which, the witness stated, "is a phosphoric or modified phosphoric acid ester."

Plaintiff's final witness was Dr. Hubert Martin. He had received the degrees of bachelor of science, master of science, and doctor of science, majoring in chemistry. In recognition of his scientific accomplishments, he was made a fellow of the Royal Institute of Chemistry, London, England, and of the Canadian Institute of Chemistry. Since 1947, he has analyzed practically the entire range of insecticides, including Parathion, and has made laboratory and field testings on such products on living nondormant plants.

As a result of his investigations, the witness expressed the opinion that the insecticidal properties of Parathion are due "to the alkylated phosphoric acid radical" contained in the product, and that "The nitrophenol radical in Parathion plays no part in the insecticidal activity" of the product—"The amount which is produced as a result of the hydrolysis is biologically insignificant" (R. 99).

There was received in evidence as defendant's exhibit "A" a slip of paper containing thereon two structural formulas as follows:

$$\text{(A)} \qquad (C_2H_5O)_2\!\!=\!\!\overset{\overset{S}{\|}}{P}-O-\langle\ \rangle-NO_2$$

$$\text{(B)} \qquad (C_2H_5O)_2\!\!=\!\!\overset{\overset{S}{\|}}{P}-O\,C_2H_5$$

Plaintiff's witness Martin testified on cross-examination that the structural formula marked "A" was that of Parathion and further identified the formula marked "B" as triethylthio phosphate (R. 115).

On re-cross-examination, the witness stated that the nitrophenol merely serves to give solubility and instability to the Parathion (R. 130–131). He then testified as follows:

R X Q. What is used in making Parathion?—A. Diethyl-chloro-phospho-thioate.

R X Q. Just those two, plus what?—A. That is one compound.

R X Q. What else is used in the reaction?—A. Sodium-para-nitro-phenate.

R X Q. Now, is diethyl per se used as an insecticide? By itself, is that used as an insecticide?—A. The radical?

R X Q. Yes.—A. No, it is too unstable.

\* \* \* \* \* \* \*

By Mr. Weil:

R X Q. Isn't it a fact that it is the reaction of the diethyl-chloro-phospho-thioate and the sodium-para-nitro-phenate, which creates a new chemical compound known as Parathion?—A. Yes.

R X Q. And Parathion is an insecticide?—A. Yes.

As disclosed by the record, plaintiff's witnesses testified substantially to the same effect as follows: That they were familiar with the products named in paragraphs 27 and 1651 of the Tariff Act of 1930, either having made some of them or observed their manufacture in industrial plants, or having supervised the testing of them as insecticides; that none of the products mentioned in the aforesaid paragraphs are used as insecticides on living nondormant plants, as is the imported product (R. 38; R. 49; R. 100); and that none of such products would be a good delivery for an order for Parathion, because, in their opinion, they would not produce the desired insecticidal effects (R. 36; R. 60; R. 69; R. 77).

It further appears from their testimony that the term "insecticide," in its broadest sense, refers not only to substances which kill insects, but to those materials which are used in any manner for insect control, whether applied to animal or plantlife, in any environment.

Defendant called as its first witness Elmore Hathaway Northey, who testified that he is employed by the American Cyanamid Co. as assistant to the director of the Lederle Laboratory Division of that firm, is presently engaged mainly in a consultive capacity, and is in charge of two or three projects of the company, one of which is the

investigation of possible utilization of insecticides in animals. He holds a Ph. D. degree in organic chemistry.

The witness testified that he was familiar with insecticides, had seen the production of Parathion, had used the product, and had studied field reports on its application. He further stated that he had used many of the products enumerated in paragraphs 27 and 1651 of the tariff act and was familiar with their use as insecticides.

Dr. Northey testified that he has seen para-nitrophenol used in the manufacture of Parathion and that the percentage of para-nitrophenol present in Parathion is about 47.7 per centum of the final weight of the molecule (R. 149).

In the opinion of the witness, Parathion is definitely a coal-tar product and is an insecticide, derived or obtained from coal tar. The witness then testified as follows:

Q. Are there any properties in Parathion which are similar to the properties of any products enumerated in Paragraph 27?—A. There are.

Q. What are they?—A. Infra red and ultra-violet spectrum of Parathion demonstrate that there is present an aromatic or benzoid ring which is certainly true since it is derived from para nitrophenol and these spectrum certainly show up the presence of that ring still in the molecule. It has retained that much character after reaction.

Q. Is that aromatic benzoid ring present in any of the products in Paragraph 27 or 1651?—A. It is present in practically all of them.

He then stated that, chemically, Parathion resembles the products enumerated in paragraph 27 or 1651 of the tariff act.

Defendant's second witness was Merrill M. Darley, who is presently employed by the General Chemical Division of the Allied Chemical and Dye Corp. as technical supervisor in charge of research on agricultural chemicals. Prior to that time, he had been a research entomologist in the research division of the same company and had been an investigator for the Crop Production Institute, investigating amines and organic radicals. He had also worked as an entomologist with the United States Department of Agriculture. His educational background includes a master of science degree from Ohio State University in entomology.

Mr. Darley testified that, while he was not familiar with the production or manufacture of Parathion, he had tested the product in the field the first year it was available to research workers, in 1948, and, since then, had made field tests on apples and peaches with that product. He had used about 150 insecticides produced by his company.

Defendant called as its third witness, Kenneth Leroy Godfrey, who stated that for 5 years he had been associated with the Monsanto Chemical Co. as research group leader concerned with the "manu-

facture of insecticides and the investigation of new insecticides," and that, in such capacity, he had been in charge of all the insecticidal work done at the West Virginia plant of that company. Prior thereto, he had been employed as research chemist and as chemist in the analytical laboratory by the same concern. He was educated at Brown University, receiving degrees as a bachelor of science and master of science in chemistry (R. 173–174). According to the testimony of the witness, his company is one of the three major producers of Parathion, the production of which, he stated, has been from three to five million pounds annually for the past several years. The witness showed a wide familiarity with the production and use of insecticides, including Parathion. Mr. Godfrey testified that Parathion is what is known as a general insecticide used to destroy insects. In his opinion, Parathion is a coal-tar product (R. 175).

Defendant's witness further testified that he was familiar with the "benzenoid nucleus" which, in his opinion, as commonly described, "consists of a cyclotronic cyclic ring which is stabilized by a conglomeration of unsaturation"; that the benzenoid nucleus is present in Parathion, in nitrophenol, and in essentially all the products *eo nomine* enumerated in paragraphs 27 and 1651; that there are certain chemical reactions which are typical of the benzenoid nucleus; and that the presence of such a nucleus in a compound usually insures that most of those reactions can be undergone by the compound (R. 180).

Defendant's fourth witness was Theodore O. Tuft, who stated that he had received the degrees of bachelor of science and master of science in entomology from the University of Utah and that he had been employed for somewhat over 6 months as an entomologist by the American Cyanamid Co., prior to which period he had been technical sales representative for that concern. He had also served on the staff of the Riverside Citrus Experiment Station, University of California, where his work concerned "screening and appraising insecticides, particularly new ones against vegetable and field crop insects" (R. 189–190).

Mr. Tuft's familiarity with Parathion, which, he stated, was an insecticide, was disclosed by the record as follows:

A. I first used Parathion against vegetable insects and later in the field against crop insects, appraised the value of it, compared it with known chemicals and I have published two articles in which Parathion is mentioned.

Defendant's fifth witness was William A. Knapp, employed by the General Chemical Division of the Allied Chemical & Dye Corp., manufacturer of heavy chemicals and insecticides, as research chemist. The technical experience of the witness included that of a "bench chemist," in which connection, he stated, he worked on and made synthetic organic insecticides (R. 200). He holds a Ph. D. degree

in organic chemistry from Yale University. He also holds United States patents on three or four compounds which are organic insecticides.

Regarding the imported product, Dr. Knapp testified that, in his opinion, Parathion is an insecticide. He further stated that the intermediates used in its manufacture are "diethyl-thio-phosphoryl-chloride, and sodium-para-nitro-phenate" (R. 204). He corroborated the testimony of previous witnesses, concerning the benezoid structure contained in the products enumerated in paragraphs 27 and 1651, and classified Parathion as a coal-tar product.

Defendant's witness Knapp further testified that cholinesterase is a chemical, and concluded his direct testimony as follows:

JUDGE MOLLISON: When you compare Parathion with those products contained in paragraph 27, which I take it those in 27 are end products, is that the shape and condition on which you make the basis of your comparison of Parathion? Do you compare Parathion with the condition, the individual identity of these materials contained in paragraph 27 just in that shape as they exist?

THE WITNESS: Yes.

On cross-examination, defendant's witness explained that the material contained in coal tar "per se" is phenol; that phenol is reacted with nitric acid, resulting in nitrophenol which, he stated, is the intermediate employed in the manufacture of Parathion; and that "assuming" the coal-tar constituent of Parathion could be taken apart, it would, based on atomic weight, be less than 50 per centum of the product.

Defendant's next witness was John H. Fletcher, employed by the American Cyanamid Co. for the past 4 years as "group leader in charge of indexing and classification of organic compounds" for that company. Prior to this time, he was in charge of a group of chemists "working on the general synthesis of compounds that might find applications as insecticides, among these Parathion in particular." He is the holder of a doctorate degree in organic chemistry.

Dr. Fletcher testified that he had made Parathion in the laboratory and had synthesized it. He classified Parathion as a coal-tar product, stating that "a coal tar product is any chemical compound which contains the benzenoid structure, or possibly a modified benzenoid structure." He was in agreement with the testimony of defendant's previous witness that the benzenoid structure is present in all but a few of the compounds listed in paragraphs 27 and 1651 and that Parathion contains a benzenoid structure.

On cross-examination, the witness stated that he had not personally applied insecticides in actual commercial use. In his opinion, the killing power of Parathion is due to the molecule power as a whole.

Summarizing the record, it further appears that defendant's witnesses testified to the effect that there are a number of products

named in either paragraph 27 or 1651 of the Tariff Act of 1930 which are either used as insecticides *per se* (R. 159–163; R. 194; R. 229), or in the production of insecticides (R. 152–153; R. 176; R. 182; R. 208–211; R. 240–242).

The basic contention of the plaintiff is that Parathion is not a coal-tar product, because its insecticidal properties are due to the non-coal-tar constituent of the compound. In this connection, plaintiff's witness Mantell distinguished Parathion from the products named in paragraphs 27 and 1651 by stating that it is the phosphoric grouping of the phosphoric acid contained therein which is basic in the composition of Parathion for its end use as an insecticide. The experience of this witness, with respect to insecticides, however, was confined solely to that of an amateur horticulturist (R. 72). Such limited qualifications of the witness do not lend much weight to his testimony covering the nature of the imported product. Plaintiff's witness, Dr. Martin, also was of the opinion that the insecticidal properties of Parathion are due to the alkylated phosphoric acid radical in the compound. This witness, in explanation of his testimony on direct examination that the triethylthic phosphate (formula "B" in defendant's exhibit "A") was not used as an insecticide, stated that it fails as a commercial insecticide because for practical purposes for use as an insecticide "it is not sufficient just to prepare a molecule containing dialkyl-thiophosphate, the dialkyl-thiophosphate radical. The molecule has to have certain other properties, solubility being one, and it must not be too stable. It must be capable of being hydrolyzed inside the organism in order that the dialkyl phosphate part of the molecule may couple or phosphorylate the enzyme." (R. 128.) In this connection, the witness admitted that the nitrophenol portion in the compound serves to give solubility and instability to the Parathion. This witness further agreed, on cross-examination, that it is the "reaction of the diethyl-chloro-phospho-thioate and the sodium-para-nitro-phenate which creates a new chemical compound," Parathion, and further agreed that Parathion is an insecticide (R. 131–132).

The witnesses for the defendant, on the other hand, all highly qualified chemists and entomologists, testified that the insecticidal properties of Parathion are due to the entire molecule making up the imported product, and to no part of it separately (R. 167; R. 187; R. 250). This pertinent testimony was corroborated by plaintiff's own witness, Dr. Haller, who agreed with the testimony of defendant's witnesses that the insecticidal properties of Parathion are due to the molecule as a whole, stating in this connection that if the compound, Parathion, were broken up it would lose its insecticidal properties (R. 30–33). Significant also in this regard is the admission of plaintiff's witness, Dr. Martin, under cross-examination, that the non-

coal-tar portion of Parathion is a radical, which is not stable, cannot exist by itself, and is not an insecticide *per se* (R. 128–129; R. 130–131).

We are persuaded from the above testimony that the coal-tar portion of the molecule is essential to the insecticidal properties of the imported product, as shown by the fact that the non-coal-tar portion, triethylthio phosphate (formula "B" in defendant's exhibit "A"), cannot be used *per se* as an insecticide and that the insecticidal properties of Parathion are due to the molecule as a whole.

Plaintiff, in maintaining that the product at bar is not "similar" to the products named in paragraphs 27 and 1651, directs our attention to the case of *Charles Hardy, Inc.* v. *United States*, 21 C. C. P. A. (Customs) 173, T. D. 46509. The court in that case stated:

> The question of law is as to the proper construction of the word "similar", as used in said paragraph 27 (a) (3). Appellant contends that its construction is controlled by the provisions of paragraph 27 (d), which reads as follows:
>
> > (d) For the purposes of this paragraph any coal-tar product provided for in this act shall be considered similar to or competitive with any imported coal-tar product which accomplishes results substantially equal to those accomplished by the domestic product when used in substantially the same manner.

The court, in the *Hardy* case, *supra*, held that the above-quoted definition of "similarity" in paragraph 27 (d), *supra*, contemplates only a determination of similarity between an imported product and a domestic product for valuation purposes under the American selling price provisions of the pertinent act and that it has no relation to a determination of similarity for classification purposes under predecessor paragraph 27 (a) (3) of the act in question. Thereupon, our appellate court held that the merchandise involved in the *Hardy* case, *supra*, was "similar" to a number of the products named in paragraph 27 of the present act "within the common meaning of the word 'similar' as defined by standard dictionaries, and as that word has been defined by this court, when used in tariff statutes, in the case of *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T. D. 42714, * * *."

Plaintiff, in the present action, in invoking the common meaning of the word "similar," as applied in the *Irving Massin & Bros.* case, *supra*, maintains, in effect, that the product at bar is not "made of approximately the same materials"; that it is not "commercially interchangeable" with the products named in paragraph 27 of the present act; that it is not "adapted to substantially the same uses," and is not "so used, ordinarily"; and that, accordingly, the imported merchandise is not "similar" to any of the products named in paragraph 27 of the present act. In our opinion, however, the construction of the word "similar," as applied in the *Hardy* case, *supra*, is no bar to a finding that the imported Parathion is "similar" for tariff

purposes to products named in paragraph 27 here in question. The controlling factors in the case at bar are that the imported product is an insecticide, as are other insecticidal products named in paragraph 27 of the relevant tariff act, and is used as such; that it contains as an essential element a coal-tar constituent; and that it possesses a common characteristic of products enumerated in paragraph 27 here under consideration, namely, the presence of a benzene or modified benzene ring in its structure.

It is contended on behalf of the plaintiff that Parathion is used exclusively on living nondormant plants, whereas none of the products named in paragraphs 27 and 1651 are so used. Apparently, it is plaintiff's theory that the imported product is not "similar" to products named in paragraph 27, because of such restricted use. In our opinion, however, the similarity in the use of Parathion as an insecticide to certain insecticidal products named in paragraph 27, *supra*, as well as its similarity in chemical composition, sufficiently qualifies it for classification as a product similar to those enumerated in the aforesaid paragraph, even though the insecticidal products named in paragraph 27, *supra*, may not be employed for the specific purpose for which the imported product is used. As a matter of fact, defendant's witnesses, Dr. Knapp and Mr. Darley, testified that dinitrophenol, a product named in paragraph 27, is used, as is the product at bar, on living nondormant plants, and, further, the latter witness stated that methylnaphthalene and xylene, coal-tar products enumerated in paragraph 1651 of the act, are also used as insecticides on living nondormant plants (R. 162–163).

It is further argued in plaintiff's brief, page 22, that the imported merchandise should not be held classifiable under a provision for "coal-tar" products, inasmuch as "Parathion is composed chiefly of a non-coal-tar constituent." In this connection, our attention is directed to the cases of American Import Co. v. United States, 25 C. C. P. A. (Customs) 231, T. D. 49337, and Veith v. United States, 10 Ct. Cust. Appls. 201, T. D. 38554. Those cases held generally to the effect that the tariff entitlement of the schedule under which a provision for imported merchandise appears may be considered as throwing light upon the subject matter therein. However, in view of our holding that the product at bar is similar for tariff purposes to products named in paragraph 27 and is obtained, derived, or manufactured in part from a product provided for in said paragraph, thus meeting the requirements of the provision under which classified, the principle announced by our appellate court in the above-cited cases is inapplicable in the determination of the issue before us.

Counsel for the plaintiff in his brief contends that, inasmuch as the Parathion at bar is a finished product, it is not classifiable under paragraph 27 of the Tariff Act of 1930, maintaining, in this connection,

that the products provided for in said paragraph are unfinished products or "intermediates." However, it appears that the products provided for in paragraph 27 also include finished coal-tar products used as such, as well as so-called intermediates provided for therein. The Summary of Tariff Information, 1929, schedule 1–7, page 134, relative to predecessor paragraph 27 of the Tariff Act of 1922, covering coal-tar products, sets forth that phenol, one of the products expressly named in said paragraph, is used both as an intermediate in the manufacture of synthetic resins, dyes, and other products and directly as an antiseptic and disinfectant. Significant also, though not necessarily controlling, on this point is the information contained in the Summary of Tariff Information, 1948 edition, volume 1, part 2, wherein at page 58 the following is stated, with reference to coal-tar products covered by paragraph 27 of the present act:

Description and uses.—The items covered by this summary are finished organic chemicals derived from coal-tar crudes (duty-free under par. 1651) and coal-tar intermediates (dutiable under par. 27; see separate summary). While most finished coal-tar products are provided for specifically in paragraph 28, the products under consideration in this summary are not included in that paragraph, and an increasing number of finished coal-tar chemicals have been classified for duty purposes under paragraph 27 (a), which contains a general provision for unspecified coal-tar products. Among the more important (i. e., important in domestic production, not in imports) groups of finished products so classified are the coal-tar surface-active agents, plasticizers, rubber-processing chemicals, and insecticides. * * *

We further observe that, at page 78 of the said summary, naphthalene, one of the coal-tar products enumerated in paragraph 27 of the present act, is used "directly as an insecticide (moth balls and flakes)." Government witnesses Northey, Darley, Knapp, and Fletcher testified to the same effect (R. 142; R. 160; R. 217; R. 228; R. 241), which testimony was corroborated by plaintiff's own witness, Dr. Martin (R. 102). Further, the record in the present case establishes that there are a great many products enumerated in paragraphs 27 and 1651 which are used per se as insecticides.

A further reason for persuading us that paragraph 27 of the present act includes finished products, as well as the so-called "intermediates," is the language contained in paragraph 27 (a) (5) of the act, which provides as follows:

all the foregoing products provided for in this paragraph, not colors, dyes, or stains, color acids, color bases, color lakes, leuco-compounds, indoxyl, indoxyl compounds, ink powders, photographic chemicals, medicinals, synthetic aromatic or odoriferous chemicals, synthetic resinlike products, synthetic tanning materials, or explosives, and not specially provided for in paragraph 28 or 1651, * * *. [Italics ours.]

Thus, paragraph 27 of the tariff act, by virtue of the provisions of subdivision (a) (5) of the said paragraph, covers coal-tar products,

not specially provided for in paragraph 28 or 1651 of the act. In *Kuttroff, Pickhardt & Co., Inc.* v. *United States*, 21 C. C. P. A. (Customs) 332, T. D. 46864, at page 339, our appellate court, in discussing the predecessor coal-tar provisions of the Tariff Act of 1922, stated:

We have in mind the history of the times, prior to and on the date of the enactment of the provisions here under consideration, and what Congress sought to accomplish by the legislation, all of which is so generally known as to require no recital here. It will be noted that the first words in said paragraphs 27 and 28 are "Coal-tar products:" and that following this term is a recital, in great detail, of the different articles and materials which it sought to bring within the paragraphs. *A study of the two paragraphs and the act as a whole prompts the conclusion that Congress was anxious to include within the said paragraphs most, if not all, coal-tar products, except those which were provided for elsewhere in the act. To accomplish this purpose it named definitely a great number of articles and materials, and then, by several general, comprehensive catch-all provisions, further greatly broadened and enlarged the scope of the paragraphs.* * * * [Italics ours.]

Paragraph 28 (referred to in paragraph 27 (a) (5), *supra*), covering finished coal-tar products, does not contain a catchall provision or basket clause, such as appears in paragraph 27 (a) (3) here in question, for coal-tar products similar to any of the products provided for in paragraph 27 or in paragraph 1651 of the Tariff Act of 1930. It appears, therefore, as indicated by the court in the *Kuttroff, Pickhardt* case, *supra*, that paragraph 27 of the present act, by reason of its broadened scope under the catchall provisions contained therein, was intended by Congress to cover within its provisions either finished or crude coal-tar products, not specially provided for or covered by the provisions of paragraph 28 or 1651 of the act.

We are persuaded, therefore, by the inclusion of a number of finished coal-tar products within paragraph 27 and by the construction of the coal-tar provisions of the act, as above enunciated, that finished coal-tar products not named or described in paragraph 28 or 1651 of the Tariff Act of 1930, such as the product at bar, are included within the provisions of paragraph 27 here in question by virtue of the language contained in subdivisions (a) (3) and (a) (5) of the said paragraph. Accordingly, plaintiff's contention herein that the imported product should not be held classifiable under paragraph 27 of the present act because it is a finished product is without merit.

Plaintiff's witness, Dr. Martin, testified concerning his theory of the action of Parathion upon insects, as developed by investigations conducted by him, as follows:

* * * The death of the insect is due not directly to Parathion, but to acetyl choline, which is a chemical produced in the insect body and in the human body. When I move any muscle, that muscle is made to act by the secretion of the acetyl choline at the nerve endings. Consequently, in the insect there must

be some mechanism by which the acetyl choline, once it has done its job, is decomposed, otherwise the muscle would remain affected. Acetyl choline is decomposed by an enzyme called choline esterase; * * * but if Parathion is introduced into the system, then that has, as it were, a greater affinity for the active centers on the choline esterase, and occupies the positions which normally would be occupied by the acetyl choline. Consequently, the enzyme is no longer able to destroy the acetyl choline. The chemical term is phosphorylated. The phosphorylated enzyme is no longer capable of destroying acetyl choline. Consequently the acetyl choline persists in the insect, and its nervous mechanism is disrupted. * * * (R. 98–99.)

Defendant's witnesses were in agreement with the foregoing explanation of the manner in which Parathion works. However, Dr. Martin, while stating that the nitrophenol radical in Parathion plays no part in the insecticidal activity of the product, admitted, on cross-examination, that Parathion (as represented by formula "A" on defendant's exhibit "A"), when used as an insecticide, has cholinesterase inhibiting properties (R. 117).

It appears, as testified to by plaintiff's witness, Dr. Martin, *supra*, that Parathion, when introduced into the system of the insect, displaces the acetyl choline (R. 98). This testimony, in our opinion, is at variance with and fails to support the conclusion expressed by the witness that the coal-tar radical in Parathion plays no part in the insecticidal activity of the product.

The preponderance of the evidence, in our opinion, establishes that the product at bar is similar to products named in paragraphs 27 and 1651 of the Tariff Act of 1930; that it possesses an element common to all the products named in paragraphs 27 and 1651, namely, a benzene or a modified benzene ring structure; that it is an insecticide and used as such, as are other products named in the aforesaid paragraphs; that the coal-tar constituent of the imported Parathion is essential to its use as an insecticide.

In view of our holding that the product at bar is a coal-tar compound, the imported merchandise is more specifically provided for as such than under the provisions of paragraph 37 of the Tariff Act of 1930 for "esters of all kinds not specially provided for," under which latter provision the plaintiff alternatively claims the Parathion in question should be held classifiable. In this connection, we note that paragraph 28 (i) of the act in question provides:

(i) Any article or product which is within the terms of paragraph 1, 5, *37*, 39, 60, 66, 82, or 1687, as well as within the terms of paragraph 27, 28, or 1651, shall be assessed for duty or exempted from duty as the case may be under paragraph *27*, 28, or 1651. [Italics ours.]

Accordingly, even though Parathion is an ester, as appears to be established by the record, it is more properly provided for within the provisions of paragraph 27 of the tariff act, inasmuch as, being a coal-

tar compound, it is specially provided for in the paragraph under which it was classified.

For all the reasons stated, therefore, we hold that the imported merchandise is properly dutiable as a coal-tar compound under the provisions of paragraph 27 (a) (3) of the Tariff Act of 1930 at the rate of 40 per centum ad valorem and 7 cents per pound, as classified.

The protest claims herein are overruled. Judgment will issue accordingly.